# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LEON LEE HOLLIS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No. CIV-16-329-RAW-KEW |
| | ) |
| MIKE BOLT, Warden, | ) |
| | ) |
| Respondent. | ) |

## OPINION AND ORDER

Now before the court are Petitioner's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 [Doc. 1] and brief in support [Doc. 10]. Petitioner, a *pro se* prisoner in the custody of the Oklahoma Department of Corrections, is currently incarcerated at the Mack Alford Correctional Center in Stringtown, Oklahoma. Following a jury trial, he was convicted of Manslaughter in the First Degree (21 O.S.2011 § 711) in Pittsburg County District Court Case No. CF-2012-270 and sentenced to thirty years of imprisonment. He is attacking his conviction and sets forth the following grounds for relief:

I. The trial court erred when admitting Petitioner's statements to police obtained in violation of the Fifth and Fourteenth Amendments.

II. The trial court violated Petitioner's Sixth and Fourteenth Amendment rights by precluding Petitioner from presenting evidence supporting his defense.

III. The introduction of improper opinion from the medical examiner invaded the province of the jury in violation of Petitioner's Sixth and Fourteenth Amendment rights.

Respondent filed a response on October 10, 2016. [Doc. 8]. Respondent concedes that the petition is timely and that Petitioner has exhausted his state court remedies for the purpose of federal habeas corpus review. The grounds for relief asserted by Petitioner herein were presented to the Oklahoma Court of Criminal Appeals ("OCCA"). The following have also been submitted to the court for consideration in this matter:

    A.       Petitioner's direct appeal brief.

    B.       State's brief in Petitioner's direct appeal.

    C.       Petitioner's appellate reply brief.

    D.       Summary Opinion affirming Petitioner's judgment and sentence.

    E.       Transcripts.

    F.       State court record.

    G.       Photographs of text messages.

    H.       Medical Examiner's autopsy report.

    I.       Audio recording of Petitioner's interview with OSBI agent John Jones (two CD-R discs, one redacted and one unredacted).

**Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act, federal habeas corpus relief is proper only when the state court adjudication of a claim:

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**Factual Background**

On July 4, 2012, Petitioner and Aaron Stewart planned a barbeque and invited friends to their home in McAlester, Oklahoma. At some point that evening, Danny Bradford, the victim in this case, arrived at the residence and talked with Petitioner and Mr. Stewart about getting high.

[Doc. 9-7 at 59-60].[1] Petitioner, Mr. Stewart and the victim had used methamphetamine together on previous occasions. *Id*. at 66. On this occasion, Mr. Stewart prepared two syringes and the three men injected methamphetamine while in the master bedroom of the house. [Doc. 9-7 at 60-63; Doc. 10 at 2].

Upon being injected, the victim "became hysterical" and began punching and slapping pictures hanging on the walls. [Doc. 9-7 at 63-64; Doc. 10 at 2]. Petitioner responded by punching the victim in the face. [Doc. 9-7 at 63]. Mr. Stewart estimated that Petitioner punched the victim five to seven times, with the victim falling back onto the bed each time, only to get up and be hit by Petitioner again. *Id*. at 64, 68. The last of the blows caused the victim to fall to the hallway floor just outside the bedroom door. *Id*. at 69. Petitioner then punched the victim two more times and kicked him in the ribs. *Id*. at 69-70. Petitioner maintained that the victim was not badly injured and that the victim left the house. But Aaron Stewart testified at trial that the victim was retrieved and brought back to the home by Petitioner. *Id*. at 83-87.

Nevertheless, at some point following the assault, the victim ended up on the floor in Petitioner's residence. *Id*. at 71-72, 86. Mr. Stewart heard gurgling sounds coming from the victim's body and the victim started coughing up blood. *Id*. at 72. Petitioner took a picture of the unconscious victim and texted it to a friend, Nancy Mills, with the caption, "I fucked this guy up." *Id*. at 180-81. Ms. Mills received the text, spoke with Petitioner on the phone, and drove over to the residence. *Id*. at 180-82. Ms. Mills observed the victim lying on the floor in the hallway. *Id*. at 183. Ms. Mills did not stay long and Mr. Stewart left with her. *Id*. at 186.

Mr. Stewart returned to the residence in the early morning hours of July 5th. *Id*. at 80. The victim was still unconscious and lying on the floor, and Mr. Stewart suggested that they call 911 or take the victim to the emergency room. *Id*. at 78. Petitioner initially hesitated, but approximately thirty minutes later, Petitioner and Mr. Stewart worked together to lift and carry the victim to Petitioner's truck. *Id*. at 79-80. Petitioner had the victim's arms, and Mr. Stewart grabbed the bottom of his legs, and the two men carried the victim out the back door of the residence. *Id*. at 80. Petitioner, however, did not take the victim to the local hospital in McAlester.

---

[1] This court's record citations refer to the CM/ECF page numbers in the upper right-hand corner of each document.

Instead, Petitioner drove the victim from his home to a hospital in Henryetta, Oklahoma. *Id*. at 226. Mr. Stewart stayed behind at the residence. *Id*. at 81-82.

The authorities became involved shortly after Petitioner arrived in Henryetta. As expected, the hospital contacted the police, explaining that a severely injured man had just been dropped off by Petitioner. *Id*. at 206. Although Petitioner in a recorded interview with authorities claimed he waited for police to arrive at the hospital, it is unclear from the record whether this actually happened. [Audio CD-R 8-8 at 6:30]. Nonetheless, Petitioner related multiple stories to authorities about where he encountered the victim and whether he was responsible for the victim's injuries. [Doc. 9-7 at 213, 222-26; Audio CD-R 8-8].

Petitioner first claimed that he was returning from his girlfriend's house in Shawnee, Oklahoma, and that, needing a bathroom break, he exited Interstate 40 at Henryetta. [Doc. 9-7 at 223]. It was at this point that, according to Petitioner, he noticed a person lying just off the road near exit 237. *Id*. Petitioner said the man was bleeding from his head and was disoriented. *Id*. He provided aid and transported the man to the hospital. *Id*. He later altered his story, however, upon being informed by police that no physical evidence near the exit ramp supported his claim. *Id*. at 224. He admitted that he had lied about being at a girlfriend's house in Shawnee. *Id*.

Petitioner next claimed that he had actually left his home that morning, was traveling to Tulsa for a doctor's appointment, and had spotted a man walking on West Street by the prison in McAlester. *Id*. at 225. In this story, Petitioner explained to the police that he had observed the man walking in the street, that the man was stumbling, and that Petitioner therefore suspected he was intoxicated or had been badly beaten. *Id*. Petitioner further explained that he did not seek medical treatment in McAlester for the man because Petitioner was known by McAlester police and he did not want anyone to think that he had hurt the man. *Id*. at 226. Authorities combed the area related by Petitioner and found no evidence supporting Petitioner's claim. [Doc. 9-6 at 140-41, 147, 152-53].

As the day progressed, Petitioner changed his story yet again during an interview with Agent John Jones of the Oklahoma State Bureau of Investigation (OSBI). Evidently believing the authorities had spoken with Aaron Stewart about the events of the previous evening, Petitioner admitted that he knew the victim, that the victim had in fact been in Petitioner's home, that

4

Petitioner "smacked that motherfucker with both my fists," and that Petitioner "whooped his ass." [Audio CD-R 8-8 at 22:38; 28:00]. Petitioner claimed he had only done so in self-defense. [Audio CD-R 8-8 at 29:00].

The victim died as a result of his injuries on July 12, 2012. [Doc. 9-7 at 158, 177-78]. Dr. Joshua Lanter, the Deputy Chief Medical Examiner for the State of Oklahoma, testified that the cause of the victim's death was blunt force trauma to the head. *Id*. at 164-65. Mr. Stewart, who witnessed the entire incident, testified that Petitioner was not acting in self-defense when he assaulted the victim. *Id*. at 143-44.

**Ground I:   The trial court erred when admitting Petitioner's statements to police obtained in violation of the Fifth and Fourteenth Amendments.**

Petitioner claims in Ground I that his statements to police should have been suppressed because he was subjected to custodial interrogation without *Miranda* warnings. *Miranda v. Arizona,* 384 U.S. 436 (1966). Petitioner contends that he was transported by a trooper in a police vehicle to the police station, placed in an interrogation room at the police station, and was arrested at the end of the interview. [Doc. 10 at 5]. In sum, Petitioner argues that a reasonable person under those circumstances would believe he/she was in custody for *Miranda* purposes. Citing *Thompson v. Keohane,* 516 U.S. 99 (1995), Petitioner argues that the OCCA did not apply an objective test to resolve whether there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest. [Doc. 10 at 5]. According to Petitioner, the OCCA based its determination on a subjective analysis of Petitioner's behavior. *Id*.

In response, Respondent contends Petitioner is not entitled to habeas relief, explaining that "the OCCA's determination of this claim is neither contrary to, nor an unreasonable application of clearly established federal law . . . [n]or was it based on an unreasonable determination of the facts." [Doc. 8 at 8].

The OCCA addressed the claim on the merits:

In Proposition I, we find the trial court did not abuse its discretion in admitting into evidence the recording of Appellant's interview with Agent Jones. *See Pope v.*

5

> *State*, 2009 OK CR 9, ¶ 4, 204 P.3d 1285, 1287 (trial court's ruling on a suppression motion reviewed for an abuse of discretion). *Miranda* warnings need not be given unless a person is in custody or otherwise significantly deprived of freedom of action. *Bryan v. State*, 1997 OK CR 15, ¶ 15, 935 P.3d 338, 351, *citing Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Before warnings are required, a person's freedom of movement must be restrained to the degree of formal arrest. *Id.*, *citing Stansbury v. California*, 511 U.S. 318, 322-23, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994). Whether Appellant was "under arrest" when police asked to question him depends on whether a reasonable person in his circumstances would have felt free to decline the officers' request. *Underwood v. State*, 2011 OK CR 12, ¶ 20, 252 P.3d 221, 235 *citing Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).
>
> Here, the evidence showed that Appellant voluntarily accompanied officers to the police station; that he was not formally arrested at the time; that he was not restrained, threatened or coerced in any way; and that he was free to leave at the end of the interview. Under these circumstances, a reasonable person in the same position as Appellant would not conclude that he was in custody. *See Andrew v. State*, 2007 OK CR 23, ¶ 72, 164 P.3d 176, 195; *Dodd v. State*, 2004 OK CR 31, ¶ 27, 100 P.3d 1017, 1029.

*Hollis v. State*, No. F-2014-135, slip op. at 2-3 (Okla. Crim. App. Apr. 24, 2015).

The audio recording of Petitioner's interview with Agent Jones and the transcripts from the jury trial have been carefully reviewed. The court has also reviewed the transcript from the hearing on Petitioner's motion to suppress, which was denied by Associate District Judge James Bland.

In *Oregon v. Mathiason*, 429 U.S. 492 (1977) (per curiam), the Supreme Court stated in pertinent part:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited.

*Oregon v. Mathiason*, 429 U.S. at 495. Basically, "*Miranda* warnings are required for custodial interrogation occasioned by an arrest, but not for questioning during an ordinary investigative

6

detention." *See Cortez v. McCauley*, 478 F.3d 1108, 1113 n. 2 (10th Cir. 2007) (citing *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)).

In the case at hand, Petitioner voluntarily met with authorities at the road-side scene and was told that he was not under arrest and was free to leave if he so desired. [Doc. 9-7 at 220-22, 227]. Petitioner gave permission for the authorities to search his truck, which was left behind at the scene, and Petitioner willingly agreed to accompany an officer to the police station in Henryetta to answer questions. [Doc. 9-8 at 20-21]. Petitioner, along with his dog, met with Agent Jones at the police station. *Id*. at 15.

During the interview, Petitioner was allowed to use his cellphone to maintain contact with other individuals. *Id*. at 15-16. At the beginning of the interview, Agent Jones stated "I told you on the phone that you're not under arrest, ok, and I appreciate you hanging around to visit with me." [Audio CD-R 8-8 at 1:07]. Agent Jones began asking questions and Petitioner willingly told his side of the story. Petitioner initially claimed that he did not know the victim. Petitioner's story quickly changed once Agent Jones mentioned Aaron Stewart. Almost immediately, Petitioner admitted that the victim had been at his house the previous night, that the victim was acting crazy and had bowed up, and that Petitioner had punched the victim several times in self-defense. Petitioner also volunteered that that the victim was known for beating up his girlfriend and that the victim was not seriously injured when he left Petitioner's residence. Towards the end of the interview, Agent Jones asked if he could keep Petitioner's blood-stained jeans. Petitioner told Agent Jones that he could have the jeans "but not until I'm done, ready to go home." [Audio CD-R 8-8 at 47:30]. Petitioner ended the interview, stating "I'm done, I'm through," and was advised that the search of his truck was not yet completed.

The undersigned agrees with the OCCA. Under the circumstances, a reasonable person in the same position as Petitioner would not conclude that he was in custody. Petitioner is quick to point out that he was transported by a trooper from the road-side scene to the police station. Nevertheless, Petitioner agreed to accompany the trooper to the police station. Moreover, there is no evidence that Petitioner was restrained, threatened or coerced. Petitioner was informed that he was not under arrest, and Petitioner voluntarily engaged with Agent Jones during the interview.

7

Petitioner was also allowed to use his phone to maintain contact with others. Petitioner was "neither taken into custody nor significantly deprived of his freedom of action." *California v. Beheler*, 463 U.S. at 1123. *Miranda* warnings were not required, and Petitioner's statements were admissible against him.

The court finds the OCCA's determination of this claim was not contrary to, or an unreasonable application, of Supreme Court law. The court also finds the OCCA's decision was not based on an unreasonable determination of the facts presented at trial. Petitioner is not entitled to habeas relief on Ground I.

**Ground II: The trial court violated Petitioner's Sixth and Fourteenth Amendment rights by precluding Petitioner from presenting evidence supporting his defense.**

In Ground II, Petitioner claims he was "prevented and prohibited from presenting a defense in violation of his Sixth and Fourteenth Amendment rights." [Doc. 10 at 6]. In summary, Petitioner explains that certain text messages were turned over to the defense prior to trial, including one text message which had been sent directly from a female third party to the victim at some point prior to his death. The text message read: "Danny y u call me? u got to know I don't want u no more. u won't be hitting and choking me no more [sic]." [Doc. 8-10].

Petitioner admits that the text message was unknown to him prior to the time it was turned over to the defense. Nevertheless, Petitioner argued at trial that the text message should be admitted because Petitioner was aware of the victim's violent tendencies and it corroborated his defense. [Doc. 10 at 7; Doc. 9-8 at 34]. The State objected to the admission of the evidence on relevancy grounds. [Doc. 9-8 at 33]. The trial court sustained the State's objection and did not admit the evidence, explaining that it was irrelevant because Petitioner was not aware of the text. *Id*. at 34-35. Petitioner argues that the evidence was "crucial," that it corroborated his defense, and that the jury "would have believed Petitioner and Mr. Stewart" if the jury had seen the text message. [Doc. 10-7 at 6-7].

8

In response, Respondent argues that Petitioner's claim is a matter of state law and beyond the scope of this court's habeas review, and that Petitioner was not denied a fundamentally fair proceeding by the trial court's decision. [Doc. 8 at 11]. In short, Respondent contends that "a right to present a defense is fundamental" but that "it is not unlimited." *Id*. at 12. For example, citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), Respondent notes that a defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." *Id*. Respondent further contends that "[h]abeas relief is possible only if Petitioner can demonstrate that his entire trial was rendered fundamentally unfair from the trial court's evidentiary decision," and "where the claim is one of improper exclusion of evidence, this Court must be convinced of the relevancy and materiality of the evidence to Petitioner's case in order to grant relief." *Id*.

The OCCA analyzed and denied relief on Petitioner's claim as follows:

> In Proposition II, we find the trial court did not abuse its discretion in denying the admission of a text message between the deceased and his girlfriend. *See Davis v. State*, 2011 OK CR 29, ¶ 156, 268 P.3d 86, 125 (admission of evidence is left to the sound discretion of the trial court and will not be disturbed absent an abuse of discretion).
> 
> In a homicide case where the defense is that of self-defense, acts of violence by the victim antecedent to the homicide may be introduced where the defendant was aware of the specific prior acts of violence and that awareness or knowledge helped form the basis for his purported fear of the victim resulting in the alleged act of self-defense against the victim, and tending to establish the victim as the aggressor. *Id*., 2011 OK CR 29, ¶ 157, 268 P.3d at 125. Under 12 O.S.2011, § 2404(A)(2), evidence of a "pertinent" character trait of a victim is admissible. Once the trial court has determined the particular character trait is "pertinent" or relevant, and an essential element of the charge or defense, proof may be made by specific instances of conduct. 12 O.S.2011, § 2405. In a case where the defense is self-defense, this "pertinency" requirement limits admission of evidence to those traits of character that would have affected the defendant's perception of the threat with which he was confronted. *Davis*, 2011 OK CR 29, ¶ 158, 268 P.3d at 125-126. Acts unknown to the defendant prior to the homicide cannot meet the "pertinency" requirement for admissibility purposes. *Id*.
> 
> In the present case, the text message was not relevant as it was not shown that Appellant was aware of the text message or that it helped form the basis for Appellant's claim of self-defense. As the text message was not relevant, its exclusion did not deprive Appellant of the ability to present a complete defense.

9

> *Davis*, 2011 OK CR 29, ¶ 156, 268 P.3d at 125 (whether Appellant was denied the right to present a defense ultimately turns on whether the evidence at his disposal was admissible).

*Hollis*, slip op. at 3-5.

This court agrees. It is well established that "[t]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky,* 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta,* 467 U.S. 479, 485 (1984)). But the exclusion of irrelevant evidence does not deprive a defendant of the ability to present a complete defense. In *Crane*, the Supreme Court provided the following guidance:

> In any given criminal case the trial judge is called upon to make dozens, sometimes hundreds, of decisions concerning the admissibility of evidence. As we reaffirmed earlier this Term, the Constitution leaves to the judges who must make these decisions "wide latitude" to exclude evidence that is "repetitive ..., only marginally relevant" or poses an undue risk of "harassment, prejudice, [or] confusion of the issues." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Moreover, we have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted. *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973).

*Crane v. Kentucky*, 476 U.S. at 689-90. *See also United States v. Scheffer,* 523 U.S. 303, 308 (1998) ("[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."). Additionally, in *Maes v. Thomas*, 46 F.3d 979 (10th Cir. 1995), the Tenth Circuit explained as follows:

> In a habeas proceeding claiming a denial of due process, "we will not question the evidentiary or procedural rulings of the state court unless [the petitioner] can show that, because of the court's actions, his trial, as a whole, was rendered fundamentally unfair." *Tapia v. Tansy,* 926 F.2d 1554, 1557 (10th Cir.), *cert. denied,* 502 U.S. 835, 112 S.Ct. 115, 116 L.Ed.2d 84 (1991). It is the materiality of the excluded evidence to the presentation of the defense that determines whether a petitioner has been deprived of a fundamentally fair trial. *Rosario v. Kuhlman,* 839 F.2d 918, 924 (2d Cir.1988).

*Maes v. Thomas*, 46 F.3d at 987. *See also, United States v. Solomon,* 399 F.3d 1231, 1239 (10th Cir. 2005) ("Simply stated, a criminal defendant does not have a constitutional right to present evidence that is not relevant and not material to his defense.").

Petitioner claims he was precluded from presenting a complete defense, and that the text message should have been admitted because Petitioner was aware of the victim's violent tendencies and it corroborated his defense. The text message, however, was sent directly from a third party woman to the victim, there is no evidence that Petitioner was aware of the text message prior to the assault, and there is no evidence that the text message helped form the basis for his claim of self-defense. It was clearly not relevant. Nor was it material to the presentation of the defense so as to deprive the Petitioner of fundamental fairness. In other words, it was not "of such an exculpatory nature that its exclusion affected the trial's outcome." *See Richmond v. Embry*, 122 F.3d 866, 872 (10th Cir. 1997). The text message was properly excluded.

The court also notes that a different text message ("State's Exhibit Number 103"), sent from Petitioner to the victim prior to the assault, was admitted and essentially set forth the same content as the excluded text message. [Doc. 9-10 at 73]. The admitted text message referred to the victim as a "womam [sic] beater," which obviously showed the victim's violent tendencies. Its admission, along with testimony from Aaron Stewart stating that he did not like the victim because the victim "disrespected" his girlfriend [Doc. 9-7 at 92], undermines any claim of fundamental unfairness. The excluded text message would have only reinforced the other evidence before the jury.

Petitioner has failed to show that the exclusion of the text message rendered his trial fundamentally unfair. *See Mitchell v. Gibson*, 262 F.3d 1036, 1055 (10th Cir. 2001). He has also failed to show the absence of this particular text message had a substantial and injurious effect on the outcome of his trial. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). There was substantial evidence indicating the victim's death was caused by Petitioner and that Petitioner did not act in self-defense. Petitioner is not entitled to habeas relief on Ground II.

**Ground III:   The introduction of improper opinion from the medical examiner invaded the province of the jury in violation of Petitioner's Sixth and Fourteenth Amendment rights.**

In Ground III, Petitioner claims "the evidence presented at Petitioner's trial by the State Pathologist proved that the injuries sustained by [the victim] were accidental." [Doc. 10 at 8].

Petitioner then maintains that the victim "left the house alive with minor injuries," that "Petitioner did not see [the victim] again until later that morning when he saw [the victim] stumbling down the street and picked him up," and that the victim "could have easily sustained the fatal injury after he left the house." *Id*. Lastly, he argues that whether the victim "received his head injury as a result of [P]etitioner's actions or accidentally was a question for the [jury]," and "[a]lthough the testimony of the pathologist [at trial] did not invade the province of the jury, the opinion on his autopsy report that the manner of death was a homicide improperly influenced the jury by telling them what result to reach." *Id*. Petitioner cites *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000), in support of his claim.

In response, Respondent argues that Petitioner's claim is a matter of state law and beyond the scope of this court's habeas review. [Doc. 8 at 16]. Respondent also argues that Petitioner has not shown the admission of the opinion in his case denied him a fundamentally fair trial. *Id*.

The OCCA rejected Petitioner's claim:

In Proposition III, we review Appellant's challenge to the testimony of the medical examiner for plain error as no objection was raised at trial. Under the test for plain error set forth in *Simpson v. State*, 1994 OK CR 40, 876 P.2d 690, an appellant must show an actual error, that is plain or obvious, affecting his substantial rights, and which seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice. *Id*., 1994 OK CR 40, ¶ 10, 26, 30, 876 P.2d at 694, 699, 701. "[P]lain error is subject to harmless error analysis." *Id*., 1994 OK CR 40, ¶ 20, 876 P.2d at 698. *See Levering v. State*, 2013 OK CR 19, ¶ 6, 315 P.3d 392, 395; *Malone v. State*, 2013 OK CR 1, ¶ 41, 293 P.3d 198, 211-212.

Opinion evidence on ultimate issues is generally admissible. *Romano v. State*, 1995 OK CR 74, ¶ 21, 909 P.2d 92, 109; 12 O.S.2011, § 2704. While expert witnesses can suggest the inferences which jurors should draw from the application of specialized knowledge to the facts, opinion testimony which merely tells a jury what result to reach is inadmissible. *Romano*, 1995 OK CR 74, ¶ 21, 909 P.2d at 109. Dr. Lanter, Chief Deputy Medical Examiner for the State of Oklahoma who conducted the autopsy of the deceased, was qualified under 12 O.S.2011, § 2702 to give his opinion as to the cause of death based upon the deceased's physical injuries. His expert opinion was properly based on his observations and conclusions after having performed the autopsy. 12 O.S.2011, § 2703. His testimony was consistent with his autopsy report and helpful to the jury. His expert opinion that the cause of death was blunt force trauma to the head did not invade the province of the jury as it did not tell the jurors what result to reach. *Contra*

12

> *Romano*, 1995 OK CR 74, ¶ 25, 909 P.2d at 110 (expert's testimony that defendant was not a passive observer to stabbing wrongly removed last inferential step and effectively told jury that defendant murdered victim). Dr. Lanter was not asked and did not testify that the manner of death was homicide, although that option was marked on the autopsy report. Finding no error in admitting Dr. Lanter's expert testimony, we find no plain error.

*Hollis*, slip op. at 5-6 (footnote omitted). The OCCA also explained that " '[h]omicide' is a legal term requiring a fact finder to make a decision after reviewing all of the evidence." *Id*. at 6 n.2.

The OCCA's determination of this claim is well-reasoned. Dr. Joshua Lanter, Deputy Chief Medical Examiner for the State of Oklahoma, conducted the autopsy of the deceased victim. [Doc. 9-7 at 157-59]. During the trial, Dr. Lanter testified that in his opinion the cause of death was blunt force trauma to the head. *Id*. at 164-65. His expert opinion did not invade the province of the jury as it did not tell the jurors what result to reach. At no point during the trial did Dr. Lanter mention the word "homicide," nor did counsel ask questions seeking his opinion as to whether the manner of death was a homicide. Be that as it may, Dr. Lanter's autopsy report was admitted without objection, and Petitioner points out that "homicide" was marked as the manner of death on page one of Dr. Lanter's autopsy report. [Doc. 8-11 at 1]. It was also mentioned again on page eleven. *Id*. at 11.

Highlighting the references to homicide, Petitioner argues that "the opinion on [Dr. Lanter's] autopsy report that the manner of death was a homicide improperly influenced the jury by telling them what result to reach" and that "the evidential error affected the outcome of the trial." [Doc. 10 at 8]. He also cites *Fox v. Ward*, 200 F.3d 1286 (10th Cir. 2000), in support of his claim. In *Fox*, however, the Tenth Circuit stated "[o]n habeas review, we will not disturb the state court's evidentiary rulings unless the appellant demonstrates that the court's error was 'so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process.' " *Fox*, 200 F.3d at 1296. Petitioner has not made this showing.

Petitioner continues to raise doubt about the victim's injuries, suggesting the injuries were consistent with an accidental fall, and arguing that the admitted autopsy report was so grossly prejudicial that it rendered the trial fundamentally unfair. But there was substantial evidence indicating the victim's death was caused by Petitioner and that Petitioner did not act in self-defense. During the interview with OSBI Agent John Jones, Petitioner admitted that he "smacked

13

that motherfucker with both my fists," and that he "whooped his ass." Mr. Stewart, an eyewitness to the assault, testified that Petitioner punched the victim five to seven times, and that the last of the blows caused the victim to fall to the hallway floor just outside the bedroom door. Petitioner then punched the victim two more times and kicked him in the ribs. At some point following the assault, Mr. Stewart heard gurgling sounds coming from the victim's body and the victim started coughing up blood. Petitioner took a picture of the unconscious victim on the floor and texted it to a friend, Nancy Mills, with the caption, "I fucked this guy up." Ms. Mills testified that she drove to the residence and observed the victim lying on the floor in the hallway.

The evidence also established that several hours later, Mr. Stewart helped Petitioner *lift and carry* the badly beaten victim from their home and load him into Petitioner's truck, with the belief that he would be transported to the local hospital for medical care. The victim was transported by Petitioner to the hospital in Henryetta, Oklahoma, on July 5, 2012. The victim died as a result of his injuries on July 12, 2012. The jury heard testimony from Dr. Lanter that the cause of death was blunt force trauma to the head, which was consistent with Dr. Lanter's autopsy report. Dr. Lanter did not testify that "homicide" was the manner of death. Lastly, and perhaps most notably, Petitioner's partner testified that Petitioner was not acting in self-defense when he assaulted the victim.

The evidence provided ample support for a conviction of Manslaughter in the First Degree (21 O.S.2011 § 711), and Petitioner fails to demonstrate that the admitted autopsy report, which set forth Dr. Lanter's opinion as to the manner of death, was so grossly prejudicial that it rendered the trial fundamentally unfair. Petitioner also fails to show that the admitted autopsy report had a substantial and injurious effect upon his trial. Petitioner's Ground III is denied.

**Certificate of Appealability**

The court further finds Petitioner has failed to make a "substantial showing of the denial of a constitutional right," as required by 28 U.S.C. § 2253(c)(2). In addition, he has not "demonstrate[d] that reasonable jurists would find [this] court's assessment of the constitutional

claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Therefore, a certificate of appealability shall be denied.

ACCORDINGLY, Petitioner's petition for a writ of habeas corpus [Doc. 1] is DENIED, and a certificate of appealability is DENIED.

It is so ordered this 12th day of September, 2019.

_____
THE HONORABLE RONALD A. WHITE
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF OKLAHOMA